UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TRACY B. ERVIN,                    )
                                   )
        Plaintiff,                 )
                                   )        No. 3:10-cv-1234
v.                                 )
                                   )        Judge Sharp
HONEYWELL TECHNOLOGY               )
SOLUTIONS, INC.,                   )
                                   )
        Defendant.                 )

**MEMORANDUM OF LAW**

This is a case about a PAAVM for HTSI who felt mistreated by her MST, then received

two FLIPILs, leading her PM to institute a PIP and, ultimately, a RIF. In other words, this case

involves the military—specifically, it concerns a retired member of the U.S. Army employed by

a military contractor at Fort Campbell. Plaintiff Tracy B. Ervin believed that she was subjected

to illegal racial harassment, discrimination, and retaliation while working at Defendant

Honeywell Technology Solutions, Inc. ("HTSI"), a logistics and support services contractor.

However, she has failed to introduce sufficient evidence to support her claim of a racially hostile

work environment, and she has pointed to only one valid adverse employment action to support

her claims of discrimination and retaliation. Because that action was motivated by a legitimate,

nondiscriminatory reason—Ervin's inadequate work performance—it is not an instance of illegal

race discrimination. Accordingly, summary judgment for Defendant is appropriate on all of

Ervin's claims.

1

# FACTS[1]

Plaintiff Tracy B. Ervin, an African-American female, began working at Defendant HTSI in June 2007, after her 2006 retirement from service in the U.S. Army. At all times relevant to this action, she was a Property Accountability and Assets Visibility Manager (PAAVM), also known as a "hand receipt holder," at Fort Campbell. In this position, she was responsible for receiving, tracking, accounting for, and distributing equipment, maintaining inventory records, and providing other equipment-related services to HTSI's customer, the U.S. Army. She worked on Team 5, which was comprised of five African-Americans, five Caucasians, and one Asian, and included two other hand receipt holders, Tim May and Todd Johnson, both Caucasian males. Team 5 was supervised by Jeffrey Marshall, who was, in turn, supervised first by a man named "Mr. Peed"[2] and then by his successor Robert "Marty" Smith, both in the position of Fort Campbell Program Manager for HTSI. All three were Caucasian males.

In 2008, Ervin wrote a memorandum to Peed detailing a number of concerns she had with Team 5, including lack of communication, missing and misused property, profanity, burping, flatulence, inappropriate religious and political conversations, gossip, an inappropriate romantic relationship between two employees, and "unfair treatment toward the minorities on this team," specifically with regard to who had access to proper office space. In response, Peed and David Dahl, a regional manager, held a meeting with

---

[1] Unless otherwise noted, all facts are drawn from Defendant's and Plaintiff's respective statements of undisputed facts (Docket Nos. 26 & 36), the related exhibits, and the responses thereto (Docket Nos. 35 & 39). Although facts are taken from submissions made by both parties, on a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. ZenithRadio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

[2] Despite the undisputed fact that at HTSI, "[e]verybody was [on a] first-name basis," (Docket No. 37-1 at 25), the Court was unable to locate a first name for Mr. Peed in the record.

Ervin and Marshall and said that they were going to address her concerns. An employee involved with the inappropriate workplace relationship was transferred, other personnel changes occurred, and offices were rearranged and reassigned. Marshall was instructed to write a letter to Ervin detailing what changes would be made to address her concerns, and he did so.

When Smith succeeded Peed as program manager, Ervin had a conversation with Smith about the general discrimination she perceived and other issues she had observed in Team 5. She told him about the letter she had written to Peed and urged him to read it. In conversations around this time, she informed Smith that she believed Marshall was impermissibly delegating some of his supervisory responsibilities to May and Johnson. She also told Smith about her belief that Marshall was trying to set her up for failure in her job duties and ignoring her concerns.[3] In response, Smith stated that he was just coming on board and would look into all the situations. Eventually, he came to the work area and made a statement indicating that Marshall was in charge and everyone was supposed to listen to what he said.

At some unspecified times between 2008 and 2010, Ervin observed crudely drawn black-and-white stick figure pictures that May would affix to the wall in his work area. Ervin recalls that one cartoon depicted a figure hitting another figure and contained words to the effect of "dumb people." Ervin felt that the cartoons were racially hostile and depicted African-Americans "being dumb or stupid," but she never spoke to management—Smith or his successor, Victor Leon—about the pictures. Ervin also complained of a mattress located in the vicinity of her work area, and described dildos and

---

[3] Ervin also contended that she told Smith about an incident in which her Social Security number was mistakenly made public (Docket No. 36 at 7), but she later conceded that she had not told Smith but rather another project manager named Marty Jones (Docket No. 37-1 at 12).

3

condoms stored above the ceiling tiles in her work area along with videotapes and magazines. When she complained to Leon, he advised her to talk to Marshall, her supervisor. Eventually the mattress was moved, but not out of the work area, and the items were discarded.

In late 2009, Ervin and two African-American colleagues raised internal complaints of unfair treatment and discrimination. These were investigated by Eric Jenkins, human resources manager for HTSI, who could not substantiate any instances of ongoing race discrimination. He informed Ervin and her fellow complainants of the results of his investigation.

In March 2010, Ervin received her annual written performance evaluation from HTSI covering the year 2009. As part of the evaluation process, employees are rated on a nine-block grid, on which "1" is the highest rating and "9" the lowest. Marshall, Ervin's supervisor, completed a performance evaluation for her on December 4, 2009, and proposed a rating of "5," meaning she was "at standard." At this level, Ervin would have been eligible for a promotion. Smith, however, overruled Marshall's rating, lowering Ervin's rating to a "6," a rating at which an employee is generally not eligible for a salary increase. He did this, he said, because she had performed poorly and was "below standard" in one area due to the fact that she had taken certain property without appropriate documentation, resulting in four separate searches for property. Ervin has admitted that she was responsible for the losses because hand receipt holders, as the employees who sign for the equipment, are primarily overall responsible for any losses. This rating prevented her from receiving a pay raise in 2010.

In April 2010, Leon took over as acting program manager for HTSI at Fort Campbell. (In May 2011, the "acting" designation was removed and he became program manager.) On April 2, 2010, Ervin and two colleagues, Rodrick White and Robert Ladson, filed charges of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging discrimination based on race and, in Ervin's case, sex. Ervin alleged that she had been subjected to retaliation since October 15, 2009, due to her internal complaints of workplace race and sex discrimination. She explained that after complaining to her supervisor, her work was more closely scrutinized, and she received a below average performance appraisal and did not get a pay raise. The EEOC investigated and issued a dismissal and notice of right to sue on September 29, 2010. She and her two coworkers filed the instant suit on December 28, 2010.[4]

In 2010, the Army twice found Ervin responsible for property that had gone missing, after it conducted Financial Liability Investigation of Property Loss ("FLIPL") proceedings. In a FLIPL, the Army assigns an officer to investigate a missing equipment incident and determine who is liable. May, a fellow hand receipt holder, was involved in one FLIPL in 2010 and was found 30% responsible. Johnson was also involved in a FLIPL before 2010, but he was not found to have any responsibility for the property loss.

In June 2010, HTSI received a request for proposals from the Army for a new contract to provide logistical and maintenance services at Army bases around the country. It responded with a proposal that, among other job reductions, reduced the number of hand receipt holder positions. HTSI was awarded the new contract and began the process of culling hand receipt holder positions from 23 to 13. Leon decided which ones to retain and

---

[4] White and Ladson's claims were voluntarily dismissed without prejudice on January 25, 2012. (Docket No. 23).

5

which to eliminate, including Ervin. He based his reduction in force decision on his observations of performance of hand receipt holders, particularly with regard to property accountability, their main job function, as reflected in FLIPL proceedings. Ervin was informed by Leon that she had been laid off on January 22, 2011. Marshall was laid off at approximately the same time as Ervin. White, one of the two African-American coworkers who had filed an EEOC charge along with Ervin, was offered a new position at Honeywell. Ladson and Todd Johnson were offered truck driver positions with LAI, another contractor at Fort Campbell.

## LEGAL STANDARD

A party may obtain summary judgment if the evidence establishes that there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of

6

evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

Ervin has stated claims of race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981, and the Tennessee Human Rights Act ("THRA").[5] "The elements of [a] *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000)). THRA claims are analyzed under the same framework as Title VII claims. *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 757-58 (6th Cir. 2012). As such, the Court's analysis will apply to the federal and state claims alike, unless otherwise indicated.

## I. Termination as Basis for Claims

HTSI argues that Ervin's termination cannot serve as the basis for her race discrimination or retaliation claim because she did not assert it in her Complaint, Amended Complaint, or filings with the EEOC or this Court. Thus, it contends, she failed to exhaust her administrative remedies with respect to termination. Moreover, her failure to exhaust cannot be excused, HTSI maintains, because the EEOC could not reasonably have been expected to investigate her

---

[5] In her Charge of Discrimination (Docket No. 27-1 at 20), Ervin complained of discrimination based on race and sex, but she alleges only race-based discrimination in this suit.

Case 3:10-cv-01234   Document 55   Filed 02/15/13   Page 7 of 21 PageID #: 477

termination when it occurred after the investigation was closed. Ervin responds that her termination could reasonably have been expected to grow out of the EEOC charge, and thus her termination is properly before the Court.

"As a prerequisite to bringing suit under Title VII, a claimant must exhaust his or her administrative remedies." *Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 470 (6th Cir. 2008). The purpose of Title VII's exhaustion requirement "is to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation." *Id.* (internal citation omitted). Accordingly, when a judicial complaint is filed, it "must be limited 'to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination.'" *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 380 (6th Cir. 2002) (internal citation omitted).

In practice, the expected scope of the investigation test means that a plaintiff's failure to exhaust can be excused "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim." *Id.* In that event, the plaintiff is permitted to sue on the uncharged, but reasonably likely to have been investigated, claim. *Id.* However, the Sixth Circuit has held that an unexhausted termination claim cannot serve as the basis of a judicial complaint where the EEOC had completed its investigation of other charges before the termination occurred. *Piette v. CSX Transp., Inc.*, 187 F.3d 637, 1999 WL 486413, at *3 (6th Cir. 1999) (per curiam). The logic is plain: it is not reasonable to expect that termination will be the probable result of any charge of discrimination, and so the EEOC cannot be expected to investigate terminations that have not yet occurred. In the instant case, the EEOC could not have investigated Ervin's termination because she was not terminated until after the investigation had concluded and, indeed, after this lawsuit was filed. Thus, Ervin has failed to exhaust her

administrative remedies with respect to her termination, and it cannot serve as the basis of a judicial claim of discrimination or retaliation.

Exhaustion issues aside, Ervin did not include a claim for termination in her Complaint or Amended Complaint, nor, evidently, did she seek leave to amend her Complaint before the May 20, 2011, deadline to add a claim based on her termination. She also did not respond to, and thus concedes, HTSI's argument that her termination claim is not properly before this Court.[6] *Wilkins v. Jackson*, 750 F. Supp. 2d 160, 162 (D.D.C. 2010) ("It is well established that if a plaintiff fails to respond to an argument raised in a motion for summary judgment, it is proper to treat that argument as conceded."). Federal Rule of Civil Procedure ("Rule") 8(a)(2) requires " 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957). To allow Ervin to assert a claim at summary judgment that she did not include in any complaint would subject HTSI to "unfair surprise." See *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005). Because she neither exhausted nor pled them, the Court finds that claims arising from Ervin's termination cannot serve as a basis for this action under Title VII, § 1981, or the THRA.[7]

## II. Hostile Work Environment Claim

Pointing to Ervin's deposition testimony that she can only recall one cartoon that she believed was racially derogatory, HTSI argues that Ervin has failed to introduce evidence of

---

[6] HTSI also notes that it has expressly opposed Ervin's effort to litigate claims related to her termination in this action, so the pleadings may not be constructively amended. (*See* Docket No. 25 at 13, n.5).

[7] While § 1981 and the THRA do not contain a mandatory administrative exhaustion scheme, *see Young v. Sabbatine*, 238 F.3d 426, 2000 WL 1888672, at *3 (6th Cir. Dec. 19, 2000) (§ 1981) *and El-Zabet v. Nissan N. Am., Inc.*, 211 F. App'x 460, 463 (6th Cir. 2006) (THRA), claims arising under those laws are equally subject to federal notice pleading requirements.

9

racial harassment to support a hostile work environment claim. Ervin contends that she has pointed to "a series of actions against her and other African-American employees which create a hostile work environment." (Docket No. 34 at 9). She urges the Court to view her termination, the negative job evaluation leading to the denial of a pay raise, and a "disciplinary action" taken against her as part of a hostile work environment claim.

In order to establish a hostile work environment claim, Ervin must demonstrate that: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment had the effect of altering the terms and conditions of her employment by creating a hostile work environment; and (5) HTSI failed to take reasonable care to prevent and correct any harassing behavior. *Russell v. University of Toledo*, 537 F.3d 596, 608 (6th Cir. 2008). A court should consider all the circumstances rather than dividing and categorizing the reported incidents, but "only harassment *based on the plaintiff's race* may be considered." *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (emphasis in original).

In *Nat'l R.R. Passenger Corp. v. Morgan*, the Supreme Court clarified that "[h]ostile environment claims are different in kind from discrete acts" such as "termination, failure to promote, denial of transfer, or refusal to hire," which are "easy to identify." 536 U.S. 101, 114-115 (2002). In "direct contrast," harassment involves repeated conduct that occurs over a period of time; "a single act of harassment may not be actionable on its own." *Id.* at 115. It is not possible to convert a time-barred discrete act claim into a hostile work environment claim even if it is related to an act alleged in timely filed charges. *Id.* at 113; *see also Burus v. Wellpoint Cos., Inc.*, 434 F. App'x 475 (6th Cir. 2011) (per curiam).

Ervin's negative job evaluation that prevented her from getting a pay raise is a discrete act and should not be analyzed as part of her hostile work environment claim.[8] As previously discussed, her subsequent termination is not before the Court. So, at the outset, her hostile work environment claim consists of: pictures Ervin believed were racially offensive; inequitable distribution of office space that disadvantaged African-Americans; Marshall's excessively harsh scrutiny of Ervin's job performance, which caused her to feel "humiliation" and "intimidation"; sexual objects and videos stored above the ceiling tiles and a mattress stored in her work area; and a privacy breach involving her Social Security number.

Ervin has failed to produce evidence that much of this conduct was based on her race. To prove that harassment was based on race, a plaintiff must either provide direct evidence of the use of race-specific, derogatory terms or comparative evidence about how the harasser treated members of both races in the workplace. *Williams v. CSX*, 643 F.3d at 511. "Conduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, she would not have been the object of harassment." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007) (citation omitted). Here, Ervin has produced no direct evidence linking Marshall's treatment of her with race discrimination, and the same is true for the sexually explicit material in her work area and the Social Security number breach. Meanwhile, the only comparative evidence she has purported to offer is her conclusory suggestion that Marshall impermissibly delegated authority to Johnson and May and supervised them less aggressively because they were white males. She has provided no evidence, beyond her own speculation, that "sheds . . . light on [Marshall's] motivations." *Williams v. CSX*, 643 F.3d at 512; *see also Perkins v. Harvey*,

---

[8] Even if the negative evaluation were to be considered part of her hostile work environment claim, the Court's analysis would not change.

11

368 F. App'x 640, 646 (6th Cir. 2010) (per curiam) (declining to find a hostile work environment where Plaintiff's "pure supposition" is all that links a series of "garden-variety personality conflicts" to racial animosity).

As for the offensive drawings, Ervin has proffered scant evidence of their existence, much less their racially discriminatory nature. In vague deposition testimony, she only recalled one "racial picture" enough to describe it: it was a "black and white picture where . . . one guy had a hammer beating a black man over the head . . . and I forgot what it was saying, calling him stupid or something like that." (Docket No. 37-1 at 16). She described it as "showing that – black people being dumb or stupid or something like that." *Id.* When she subsequently produced this picture in a blurry, illegible format, it seemed to show crude stick figures in silhouette. (Docket No. 27-8). While the caption is unclear, neither figure's race is discernible. And even if the caption does contain a racially offensive message, evidence of one inappropriate image does not create a jury question regarding a hostile work environment. *See, e.g., Smith v. Leggett Wire Co.*, 220 F.3d 752, 760-61 (6th Cir. 2000) (racial slur, racially offensive cartoon, racist joke, and reference to African-American employee as "gorilla" over 20-year period does not create fact issue of hostile work environment).

Finally, Ervin points to a racial disparity in office allocation as evidence to support her hostile work environment claim. However, she concedes that HTSI remedied the situation in response to her written complaint. (Docket No. 37-1 at 22). While the disparity in office assignments qualifies as indirect evidence of illegally race-based conduct, HTSI took reasonable care to correct the harassing behavior it once it was called to its attention, eliminating employer liability. *See Russell*, 537 F.3d at 608.

12

Although it is necessary to examine each piece of harassment evidence Ervin cites to determine if it is "based on the plaintiff's race," *Williams v. CSX*, 643 F.3d at 511, the Court is mindful that, when evaluating a hostile work environment claim, it must consider the "totality of the circumstances" and should not "carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode," *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999). Instead, the Court must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 501 (6th Cir. 2009) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)). The proper inquiry is "(1) whether a reasonable person would find the environment objectively hostile, and (2) whether the plaintiff subjectively found the conduct 'severe or pervasive.'" *Williams v. General Motors Corp.*, 187 F.3d 553, 568 (6th Cir. 1999).

Ervin's claim falls far short of the mark. The racially discriminatory conduct she alleges—one or more drawings and an racially imbalanced distribution of office space—was isolated and did not physically threaten her, nor could it have unreasonably interfered with her work performance. Even if she personally found the conduct severe or pervasive, no reasonable jury could conclude that the environment was objectively hostile. Indeed, the evidence of race discrimination Ervin has presented is much less pervasive or severe than that presented by other plaintiffs whose hostile work environment claims were resolved against them as a matter of law. *See, e.g., Ladd*, 552 F.3d at 500-01 (sexual orientation slurs used by co-workers, other sexual remarks, comments regarding women's workplace inferiority, equipment tampering by co-workers, reference to plaintiff as "black bitch," taken together, do not create an actionable hostile work environment claim) *and Kelly v. Senior Centers, Inc.*, 169 F. App'x 423, 429 (6th Cir.

2006) (two staff members' use of the word "nigger," description of someone as a "token black," comments that people were slovenly or were "pigs" and tolerance of others' similar conduct, three racist jokes, and comments about an African-American staff member's bathroom habits do not create an jury question of hostile work environment).

Ervin's solitary reliance on *Jackson v. Quanex* is only instructive insofar as it exposes the vast differences between her employment situation and the hostile work environment at Quanex Corporation in the 1980s and early 1990s. *See* 191 F.3d at 651-55 (jury question exists where evidence shows that supervisors routinely used the word "nigger" and other racial slurs and discussed their pride in firing minority employees; workplace restrooms had graffiti stating "KKK is back" and depicting lynchings; Caucasian workers falsely accused an African-American worker of stealing $300 in an attempt to get that worker fired; African-American worker's shirt was defaced with the slur "Nigger Sucker," his work area was vandalized with crude racial images, and a dead animal was left at his workstation as an apparent threat; African-American workers were disproportionately disciplined by factory supervisors and were not promoted; and Caucasian worker wore a swastika emblem to work). The frequency, severity, and invasiveness of the racially discriminatory conduct at HTSI do not approach this level.[9] Accordingly, Ervin's hostile work environment claim fails as a matter of law.

## III.  Discrimination and Retaliation Claims

HTSI contends that only two of the activities Ervin has identified are "materially adverse employment actions"—her termination and her failure to receive a salary increase in 2010 due to her negative 2009 performance evaluation—and that "neither racial animus nor a retaliatory motive played a role in either of these employment decisions." (Docket No. 25 at 17). Her

---

[9] Moreover, Ervin cannot establish that "HTSI failed to take reasonable care to prevent and correct any harassing behavior," as the record indicates it investigated her claims of race discrimination multiple times and took corrective measures where her claim was substantiated.

below-average performance evaluation was based on the legitimate reason that she was responsible for the loss of Army equipment, they argue, a point she has conceded. They contend that she has failed to offer proof that she was treated less favorably than her similarly situated white counterparts, May and Johnson.

Ervin, for her part, argues that she has established claims of discrimination and retaliation based on her "termination, disciplinary actions, performance evaluations, and loss of compensation." (Docket No. 34 at 13). With regard to her discrimination claim, she contends that she can establish an inference of discrimination because "'similarly situated' white employees were treated more favorably," and that HTSI's stated reason was pretextual because the decisions adversely affecting her "were made by non-African-American supervisors using subjective criteria." *Id.* at 15. As for her retaliation claim, she argues that the temporal proximity between her "repeated complaints of discrimination through multiple supervisors over an extended period of time and the resulting retaliatory conduct of coworkers and supervisors shortly after her complaints" is sufficient to raise an inference that her complaints were the likely reason for the adverse action.

### A. Discrimination

To establish a *prima facie* case of discrimination based upon indirect evidence, Ervin must show that (1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was treated differently than similarly situated non-protected employees. *Russell v. Univ. of Toledo,* 537 F.3d 596, 604 (6th Cir.2008) (quotation marks and citation omitted). To demonstrate that she was qualified, Ervin "must prove that [s]he was performing [her] job at a level which met [her] employer's legitimate expectations." *Meadows v. Ford Motor Co.*, 21 F. App'x 302, 304 (6th Cir. 2001) (per

curiam) (internal quotations and citation omitted). "The fourth prong requires that the plaintiff show that the person treated more favorably was similarly situated to the plaintiff in all relevant respects." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007). "In the context of personnel actions, the relevant factors for determining whether employees are similarly situated often include the employees' supervisors, the standards that the employees had to meet, and the employees' conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003).

If Ervin meets this burden, HTSI must articulate, through the submission of admissible evidence, a "legitimate, non-discriminatory reason" for the challenged employment decision. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). Then Ervin, who at all times retains the ultimate burden of persuasion, must demonstrate either that "a discriminatory reason more likely motivated [HTSI]" or that HTSI's "proffered explanation is unworthy of credence." *Id.* at 256. She can make the latter showing by demonstrating that HTSI's stated reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.' " *Johnson v. Kroger,* 319 F.3d at 866.

The 2009 evaluation that prevented Ervin from receiving a salary increase is the only adverse employment decision she has established. An adverse employment action

> constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Such action usually inflicts direct economic harm. An employment action must amount to a materially adverse change in the terms or conditions of employment to be actionable. The action must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A *de minimis* employment action is not materially adverse and, thus, not actionable.

*Freeman v. Potter*, 200 F. App'x 439, 442 (6th Cir. 2006) (internal quotations and citations omitted). Such an action must be "objectively intolerable to a reasonable person." *Id.* The only "materially adverse" action put forward by Ervin that implicates her responsibilities and "inflicts

direct economic harm" is her 2009 evaluation.[10] In it, Marshall gave her an "at standard" rating of 5, which would have made her eligible for a pay increase, but Smith, his supervisor, overruled him, lowering her rating to 6, a score that rendered her ineligible for a pay increase.

However, Ervin cannot establish that she was "qualified for the position" because, as she acknowledges, Smith "changed [her] evaluation because she was below in one area. Smith advised that Ervin had performed poorly during the time period assessed because 'she took from 159th without proper documentation. This resulted in four separate searches for property.'" (Docket No. 36 at 8). She has admitted that she was responsible for the loss, and for any loss, because she signed for the equipment. *Id.* at 9. By her own admission, she was not performing her job at a level that met her employer's expectations. *See Meadows*, 21 F. App'x at 304.

Moreover, Ervin cannot establish that similarly situated, non-protected employees were treated more favorably than she was. She has introduced no evidence to support her contention that May and Johnson got good evaluations and received raises despite having "excessive negative actions in their personnel file, including property loss, and accidents." (Docket No. 36 at 9). She does not dispute that the only FLIPL investigation paperwork in the record reveals that Johnson "was determined not to be responsible for the property loss" in 2009, and May "was determined to be 30% responsible" in another FLIPL in 2010. (Docket No. 35 at 5). May, in another instance, was "in a car that was hit by another driver." *Id.* Because she had "performed poorly" in 2009 due to her responsibility for missing property, while Johnson and May had not been found responsible for missing property that year, their conduct differed and they were not "similarly situated." [11] *See Johnson v. Kroger*, 319 F.3d at 867.

---

[10] Her termination is not before the Court. *See supra* Sec. I.

[11] In 2010, which is not relevant to her 2009 evaluation but bears on HTSI's treatment of Johnson and May, the Army found Ervin liable in two FLIPL proceedings, while May was found 30% liable in one.

Even assuming Ervin could make a *prima facie* showing of race discrimination, HTSI has articulated a legitimate, nondiscriminatory reason for her negative evaluation—her poor performance. She has conceded its basis in fact, and has failed to create a genuine issue of fact to support her argument that poor performance did not actually, or was not sufficient to, motivate HTSI's conduct. (*See* Docket No. 34, Plaintiff's Response in Opposition to Summary Judgment, at 15 (arguing that her non-African-American supervisors used subjective criteria to evaluate her, and that her white colleagues had similar or worse records than she did)). For the same reasons her *prima facie* case fails, her two-sentence pretext argument fails too. No reasonable jury could find that discrimination more likely motivated Ervin's termination than her poor performance, or that HTSI's proffered reason is unworthy of belief. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998).

### B.      Retaliation

To prove retaliation, Ervin must show that (1) she engaged in protected activity; (2) HTSI knew that she was engaged in the activity; (3) an adverse employment action was subsequently taken against her; and (4) there was a causal connection between the activity and the adverse employment action. *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008). Once an employee presents sufficient evidence to make out a *prima facie* case, the familiar *McDonnell-Douglas* burden shifting mechanism described above requires HTSI to articulate a legitimate, non-discriminatory reason for her negative evaluation, and her to demonstrate that it is pretextual, or that retaliation more likely motivated her poor review. *See supra* Sec. III.A.

Ervin engaged in protected activity on numerous occasions, although some dates are unclear in the record. Title VII protects a broad category of "opposition" to discriminatory practices, provided the manner of opposition is reasonable. *Johnson v. Univ. of Cincinnati*, 215

18

F.3d at 580 (noting that "there is no qualification on who the individual doing the complaining may be or on the party to whom the complaint is made known – i.e., the complaint may be made by anyone and it may be made to a co-worker, newspaper reporter, or anyone else about alleged discrimination against oneself or others"). Ervin has established that she engaged in protected activity when she wrote her 2008 memorandum to Peed, when she and her coworkers filed an internal discrimination complaint in late 2009, and when she filed a charge of discrimination with the EEOC in April 2010.[12]

Ervin argues that temporal proximity alone allows the Court to infer a causal connection between her complaints of discrimination and her subpar performance review. Her argument is not without support in Sixth Circuit case law. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (finding sufficient evidence to support a causal connection where plaintiff was terminated just over three months after filing an EEOC charge of discrimination). However, *Singfield* appears to be an outlier. "At this point, our case law can fairly be characterized as recognizing the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400-03 (6th Cir. 2010) (engaging in a lengthy discussion of Sixth Circuit precedent); *see also Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim.").

To be sure, temporal evidence is all Ervin has offered to connect her complaints to the adverse employment action. She filed the relevant internal complaint in "late 2009." (Docket No.

---

[12] The lack of details in the record prevents the Court from finding other specific instances of protected opposition by Ervin.

35 at 8). This is the only protected activity that is near in time to the negative performance review, which was issued on December 7, 2009, according to the undisputed declaration of Jenkins, the human resources manager (Docket No. 27-6). But nowhere in the record has Ervin established the precise date of her internal complaint. Jenkins testified that "very early in the year" 2010 would have been "several weeks" after the phone call he received from Smith "very late in 2009" informing him of "an issue with three employees." (Docket No. 37-2 at 6-7). Beyond that, the record is silent.[13] This ambiguous timeline, with no other evidence to support Ervin's contention that her negative performance evaluation was caused by her complaint of discrimination, cannot satisfy the fourth prong of her *prima facie* case. *See Vereecke*, 609 F.3d at 401 ("The absence of close temporal proximity and the presence of an obviously nonretaliatory basis for the defendants' decision amount to insufficient evidence to permit an inference of retaliatory motive.").

Assuming for the sake of argument that Ervin has met her *prima facie* burden, HTSI has put forth a legitimate, nondiscriminatory reason for her negative evaluation, as discussed earlier. With only evidence of a temporal connection, Ervin cannot establish that it was pretextual. "[T]he law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001)). As with her discrimination claim, Ervin cannot demonstrate that HTSI's legitimate, nondiscriminatory reason was pretextual. Summary judgment will be entered on her discrimination and retaliation claims.

---

[13] It is undisputed that Ervin did not learn of her negative evaluation until March 2010, which forecloses the possibility that she lodged her late 2009 internal complaint of discrimination after receiving the negative evaluation.

## **CONCLUSION**

Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment (Docket No. 24) on all claims.

An appropriate Order shall be entered.

_Kevin H. Sharp_
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE